# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ELI MARTINEZ,

    Plaintiff,

    v.                                                  Case No. 18-CV-1909

MINERVA SANTIAGO and
OSCAR GARAY,

    Defendants.

## DECISION AND ORDER ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Eli Martinez sues probation officer Minerva Santiago and Santiago's supervisor, Oscar Garay, under 42 U.S.C. § 1983 for violation of his due process rights stemming from his alleged unlawful detention between March 15 and March 20, 2018. The defendants have moved for summary judgment, arguing that Martinez cannot show a constitutional violation under the Due Process Clause. For the reasons that follow, the defendants' motion is granted and this case is dismissed.

## UNDISPUTED FACTS

Eli Martinez and Hector M. Rodriguez are brothers. (Defendants' Proposed Findings of Fact ("DPFOF") ¶¶ 8–9, Docket # 28 and Plaintiff's Resp. to DPFOF ("Pl.'s Resp.") ¶¶ 8–9, Docket # 37.) Martinez was born on December 22, 1976 and Rodriguez was born on April 4, 1974. (*Id.*) In 2015, Rodriguez was involved in a domestic violence incident in which he identified himself to police as "Ely M. Martinez" and provided his brother's date of birth of December 22, 1976. (*Id.* ¶¶ 10–11.) In April 2015, Rodriguez was convicted

of substantial battery and disorderly conduct and ordered to serve four years of probation. (*Id.* ¶ 12.) While Rodriguez's real name was known as of the time of his conviction, his real date of birth was not. (*Id.*) Therefore, Rodriguez's judgment of conviction listed "Ely M. Martinez" as an alias, but incorrectly listed his date of birth as December 22, 1976. (*Id.*) In May 2015, a warrant was issued for Rodriguez's arrest, listing "Ely M. Martinez" as an alias. (*Id.* ¶ 15.) Rodriguez's probation officer at the time, Juana Flores, submitted a recommendation for administrative action, listing Rodriguez's date of birth as December 22, 1976. (*Id.* ¶ 16.) In July 2016, Flores left the Department of Corrections ("DOC") and Rodriguez's case was transferred to Agent Minerva Santiago. (*Id.* ¶ 17.) Agent Santiago, however, never met Rodriguez because he immediately absconded. (*Id.*)

In 2017, Agent Santiago received information apparently relating to Rodriguez's whereabouts. Specifically, a man named Hector Rodriguez, Jr. had renewed his driver's license and updated his home address. This man's date of birth matched the date of birth on the Hector M. Rodriguez judgment of conviction and apprehension request (i.e., Martinez's date of birth of December 22, 1976). (*Id.* ¶ 18.) Agent Santiago took this information and amended the outstanding apprehension request to include the newly discovered driver's license number. (*Id.* ¶ 19.) Agent Santiago later received a phone call from a Hector Rodriguez, Jr. stating that police came to his house to arrest him on a DOC warrant, but he told the police that he was not on probation. He was then told to contact Agent Santiago to address the warrant. (*Id.* ¶ 20.) Hector Rodriguez, Jr. went to Agent Santiago's office and explained that he was not the Hector M. Rodriguez that was on probation. Hector Rodriguez, Jr. gave Agent Santiago a copy of his driver's license, which showed that he was Hector Rodriguez, Jr., and not Hector M. Rodriguez, the man actually on probation. Agent

Santiago also took down his phone number. (*Id.* ¶ 21.) Agent Santiago then amended the apprehension request again to remove Hector Rodriguez Jr.'s driver's license number and to correct the FBI number for Hector M. Rodriguez. (*Id.* ¶ 22.)

On Wednesday, March 14, 2018, the police were dispatched to the residence of Eli Martinez in response to a domestic violence complaint from Martinez's partner, Sandra Collazo. (*Id.* ¶ 24.) Martinez was arrested for Battery – Domestic Abuse at approximately 6:00 p.m. and was brought to the Milwaukee County Jail at approximately 7:00 p.m. (*Id.* ¶ 25.) Because Rodriguez had previously used his brother's date of birth and a slight variation on his name as an alias, Eli Martinez was booked as Ely Martinez (aka Hector M. Rodriguez) with a date of birth of December 22, 1976. (*Id.* ¶¶ 26–27.)

On Thursday, March 15, 2018, the District Attorney's office decided not to press charges against Martinez for the alleged battery. (*Id.* ¶ 28.) Before the Milwaukee County Jail released Martinez, however, a warrant check was completed to ensure that there were no outstanding warrants against him. (*Id.* ¶ 29.) The inquiry resulted in discovery of the May 2015 warrant for "Hector M. Rodriguez," date of birth December 22, 1976, with an alias of "Ely M. Martinez." (Declaration of Oscar Garay ("Garay Decl.") ¶ 27, Ex. 1002, Docket # 29.) This information was forwarded to Agent Santiago and her supervisor, Oscar Garay, in an email at 9:28 p.m. on March 15, 2018. (*Id.*) The next morning, on Friday, March 16, 2018, Agent Santiago and Garay received and read the email. (DPFOF ¶ 33.) Because of the previous misidentification of Hector M. Rodriguez in 2017, Agent Santiago and Garay met to ensure that they did not mistakenly have Hector Rodriguez, Jr. in custody. (*Id.* ¶ 34.) Agent Santiago contacted Hector Rodriguez, Jr. and confirmed that he was not the one in custody; thus, at this point, Agent Santiago and Garay believed that they

3

had the correct Hector M. Rodriguez in custody. (*Id.* ¶ 35.) Thus, an Order to Detain was generated by DOC jail liaison Brenda Muench. (*Id.* ¶ 36.) The Order to Detain identified the person in custody as "Hector M. Rodriguez," but noted that the person was booked as "Ely Martinez." (*Id.* ¶ 37.)

Later that morning, Martinez's partner, Collazo, met with Agent Santiago and Garay, telling them that they had Eli Martinez in custody, not Hector M. Rodriguez. (*Id.* ¶ 38.) Garay talked to Collazo and informed her that they would work as fast as they could, but that they "did have to properly identify the person [they] had in custody." (Garay Decl. ¶ 30.) Garay told Collazo that Agent Santiago would facilitate the identification of Eli Martinez and Hector M. Rodriguez and stepped out of the meeting. (*Id.*) At this point, Collazo provided Agent Santiago with Eli Martinez's social security card and told her that Martinez had a brother named Hector M. Rodriguez. (DPFOF ¶ 40.) Collazo informed Agent Santiago that Martinez had been on parole in Pennsylvania and provided Agent Santiago with the contact information for Rodriguez's wife and Martinez's prior parole agent in Pennsylvania, Christopher McGrath. (*Id.*)

With Collazo present, Agent Santiago attempted to contact Rodriguez's wife, but no one answered the phone call. (*Id.* ¶ 41.) Collazo told Agent Santiago that she would follow-up with Rodriguez's wife and get back to Agent Santiago. (*Id.*) Agent Santiago also contacted McGrath while Collazo was present. (*Id.* ¶ 42.) McGrath testified that he supervised Martinez from March 8, 2015 until December 20, 2016. (Deposition of Christopher McGrath at 11, Declaration of Kyle Borkenhagen ("Borkenhagen Decl.") ¶ 8, Ex. H, Docket # 39.) McGrath testified that he would be able to identify Martinez if shown a photograph. (*Id.* at 11, 14.) McGrath provided Agent Santiago with several dates during

their telephone conversation (*id.* at 16–24), including a date showing that Martinez was incarcerated between August 2014 and March 9, 2015 (*id.* at 22)—i.e., during the time that Hector M. Rodriguez was involved in the domestic violence incident in which he identified himself to police as "Ely M. Martinez" with his brother's date of birth.

Agent Santiago avers that after contacting McGrath, she then contacted Brian Hoffman, an employee of the State of Pennsylvania's Records Office, and requested identifying information, including photographs and FBI numbers, for Eli Martinez and Hector M. Rodriguez. (Declaration of Minerva Santiago ¶ 21, Docket # 30.) Agent Santiago testified that she could not remember whether she spoke with Hoffman on March 16 by telephone. (Deposition of Minerva Santiago ("Santiago Dep.") at 99, Borkenhagen Decl. ¶ 5, Ex. D.) Agent Santiago avers that Hoffman said he would send her the requested information by email as soon as possible. (*Id.*)

Meanwhile, while Agent Santiago was speaking with Collazo, Garay returned to his office to review the "Inmate Locator" website, which is a Milwaukee County public website that provides basic arrest information such as a picture of the individual and pending charges. (DPFOF ¶ 44.) Garay saw a picture of Eli Martinez on the "Inmate Locator" website; however, Garay wanted to compare Martinez's information with the booking information from Hector M. Rodriguez's January 2015 arrest. (Garay Decl. ¶ 31.) Garay avers that although he requested access to a jail booking program available only to supervisors in order to cross-reference booking information between the "Hector M. Rodriguez," a.k.a. Ely Martinez currently in custody and the Rodriguez arrested in 2015, he did not receive the password for the program until Tuesday, March 20, 2018. (*Id.* ¶¶ 31–34.)

Agent Santiago testified that at some point that morning (either before or after speaking with Collazo), she contacted Pamela Steiger, the DOC liaison at the Milwaukee County Jail, regarding obtaining booking documents for Hector M. Rodriguez's January 2015 arrest. (Santiago Dep. at 90–91.) Steiger emailed Agent Santiago at 10:57 a.m. on March 16, 2018, with a copy of a booking photo for "Rodriguez." (Borkenhagen Decl. ¶ 10, Ex. J.) Agent Santiago testified that the photograph was in black and white and was blurry. (Santiago Dep. at 89.) Steiger stated that she would put the original copy of the photograph in the mail. (Borkenhagen Decl. ¶ 10, Ex. J.) The photograph Agent Santiago received, however, was dated March 15, 2018, indicating that it was a photograph of the individual recently booked (Deposition of Pamela Steiger ("Steiger Dep.") at 26, Borkenhagen Decl. ¶ 9, Ex. I), not a photograph of Hector M. Rodriguez from 2015 (Santiago Dep. at 91–92).[1] Agent Santiago also sought a copy of Rodriguez's fingerprints; however, Steiger informed her that she would need to make a formal open records request to obtain those. (Borkenhagen Decl. ¶ 10, Ex. J.)

Thus, that same day, Agent Santiago submitted an open records request in which she requested "the arrest booking pictures and fingerprint pattern and number of Hector Rodriguez DOB [redacted] AKA: "Ely Martinez." Arrest Date: 1/31/15." (*Id.* at 3.) Agent Santiago further stated that:

> The person mentioned above provided false information (his brother [sic] information Eli Martinez) during his arrest back in 2015. The information requested is necessary to correct his Judgment of Conviction and to make sure we can place the right person in custody. Due to this situation his FBI number and some information on CIB are mixed or linked to the wrong person. His

---

[1] The parties dispute exactly when Agent Santiago realized that she had the wrong photograph. (DPFOF ¶ 64 and Pl.'s Resp. ¶ 64.) While Agent Santiago asserts she did not realize she had a photograph from 2018 instead of 2015 until Monday, March 19, Martinez argues that Agent Santiago would not have requested the photograph in her Open Records Request if she believed that she already had the photo. (*Id.*) This dispute of fact, however, is immaterial.

brother Eli Martinez was recently arrested on 03/15/18 and placed on hold due to this situation. It[']s a very complex case and your help will be greatly appreciated.

(*Id.*) While a formal records request is necessary to receive fingerprint records, a formal records request is not necessary to receive a booking photograph. (Steiger Dep. at 27–29.) Although Agent Santiago's normal work hours are from 7:45 a.m. to 4:30 p.m. on Monday through Friday, she had previously planned to take the afternoon of Friday, March 16 off to celebrate her birthday. (DPFOF ¶¶ 58–60.) Agent Santiago stayed late, however, to work on Martinez's case and left work at 3:30 p.m. that day. (*Id.*) Neither Agent Santiago nor Garay were scheduled to work or did work on Saturday, March 17 or Sunday, March 18. (*Id.* ¶ 61.)

On Monday, March 19, 2018, Martinez was transferred to the Milwaukee Secure Detention Facility ("MSDF"). (*Id.* ¶ 62.) That afternoon, Agent Santiago followed-up with Steiger regarding Martinez's booking photograph. (*Id.* ¶ 63, Ex. J at 1.) Steiger informed her that she had not yet put the original photograph in the mail, but told her that she could come over to the jail and pick the photograph up. (Santiago Decl. ¶ 33, Ex. 1014.) Agent Santiago was also waiting for information from the Pennsylvania Records Office, and at 12:03 p.m. on March 19, she emailed Hoffman asking when she could expect to receive the "information/pics?" (Santiago Decl. ¶ 35, Ex. 1015.) Hoffman responded at 1:32 p.m. with photographs of both Martinez and Rodriguez, and at 2:50 p.m. with additional information, including the FBI number and Social Security numbers for both men. (*Id.*)

After receiving identifiers for both Martinez and Rodriguez and comparing them, Agent Santiago averred that she met with Garay and explained that she believed that she had enough information to positively identify the person in custody. (*Id.* ¶ 36.) Agent Santiago and Garay decided to interview the person in custody to conduct an in-person

7

comparison of the identifier pictures (*id.*); however, given it was close to the end of the work day, they decided to wait until the next morning to conduct the interview (*id.* ¶ 38). Agent Santiago also averred that she believed that all MSDF release requests needed to be submitted by 2:45 p.m.; thus, even if she had attempted to see Martinez that day and get him released, he would not have been released until the next day anyway. (*Id.* ¶ 39.) Garay also averred that he believed it was the MSDF policy that to release an offender the same day, paperwork needed to be submitted by 2:45 p.m. (Garay Decl. ¶ 44.) The MSDF, however, did have a policy for emergency releases to be processed after the cut-off deadline. (Deposition of Niel Thoreson ("Thoreson Dep.") at 19–24, Borkenhagen Decl. ¶ 12, Ex. L.) While Niel Thoreson, the Regional Chief for the Division of Community Correction in Milwaukee County, testified that he believed that a person being held "illegally or without a basis" would constitute an emergency situation (*id.* at 23), the email Garay received regarding the MSDF's emergency policy stated that "if you have an emergency situation where you need to have an offender released after this deadline [of 2:45 p.m.], MSDF has agreed to work with us to the extent they are able. An example of emergency would be an offender with medical concerns" (Garay Decl. ¶¶ 43–44, Ex. 1004).

On the morning of Tuesday, March 20, Agent Santiago met with Eli Martinez at MSDF. (DPFOF ¶ 73.) In reviewing the documentation that she received from Pennsylvania, Agent Santiago saw that Eli Martinez was on supervision in Pennsylvania from 2013 to 2016. The pictures from Pennsylvania resembled the person she was interviewing. Agent Santiago saw Eli Martinez's tattoos on his arms that were listed in the Pennsylvania record. She also compared FBI numbers to Eli Martinez's criminal record and Hector M. Rodriguez's criminal record. (*Id.*) Agent Santiago also showed Hector M.

Rodriguez's Pennsylvania mug shot to Eli Martinez and asked him who that person was. He told Agent Santiago that it was his brother Hector M. Rodriguez. After verifying all the information with Eli Martinez, Agent Santiago ended the meeting and proceeded to have him released from custody. (*Id.* ¶ 74.) Upon determining that Eli Martinez was not the person on supervision, Agent Santiago attempted to have him released immediately by going to the MSDF Records Office in an attempt to cancel the hold directly, but she was told that the hold cancellation would have be completed electronically by an agent. (*Id.* ¶ 75.) Agent Santiago called Garay and confirmed that the person in custody at MSDF was not Hector M. Rodriguez and he told her that if she was confident, to cancel the hold immediately. She explained to him that she was not able to cancel the hold in person, that it had to be completed electronically. Garay told Agent Santiago that he would take care of it. (*Id.* ¶ 76.) Because Agent Santiago was not in the office and Garay and Agent Santiago wanted to get the hold cancelled as soon as possible, Garay requested that Agent Sue Her cancel the hold. The Order to Detain Cancellation email was sent to Agent Santiago shortly after, at 10:05 AM. (*Id.* ¶ 77.) Garay received an email later that afternoon with the hold cancellation confirmation and Martinez was released from MSDF later that afternoon. (*Id.* ¶¶ 78–79.)

## LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (quoting *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Martinez sues Agent Santiago and Garay under 42 U.S.C. § 1983, alleging that the defendants violated his rights under the Due Process Clause of the Fourteenth Amendment by keeping him in custody when they either knew, or recklessly disregarded, that they had the wrong person. (Compl. ¶¶ 35–39.) The defendants argue that they did not, as a matter of

law, violate Martinez's due process rights; however, even if they did, they are entitled to qualified immunity. (Defs.' Br. in Supp. of Summ. Judg., Docket # 27.)

To succeed on a claim under § 1983, Martinez must prove that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) this conduct deprived Martinez of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327 (1986). Claims that are based on the continued detention of individuals after they have been arrested on a valid warrant are governed by the Due Process Clause. *See Patton v. Przybylski*, 822 F.2d 697, 700–01 (7th Cir. 1987); *see also Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988) (noting "at some point after a person is arrested, the question whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause").

Martinez does not allege that his March 14, 2018 arrest for battery was unlawful, nor does he allege that the warrant for Rodriguez's arrest issued in May 2015 was unlawful. Rather, Martinez's due process claim stems from his continued detention after the defendants allegedly were aware that he was not the person named in the May 2015 warrant. The seminal case addressing such mistaken identity due process claims is *Baker v. McCollan*, 443 U.S. 137 (1979). In *Baker*, Leonard and Linnie McCollan were brothers. *Id.* at 140. Leonard procured a duplicate of Linnie's driver's license, identical to the original in every respect except with Leonard's picture on it instead of Linnie's. *Id.* Leonard, pretending to be Linnie, was arrested on narcotics charges in Potter County, Texas. *Id.* at 140–41. Leonard was booked as Linnie McCollan, signed various documents as Linnie McCollan, and was released on bail as Linnie McCollan. *Id.* at 141. Leonard's bondsman

sought and received an order allowing him to surrender his principal and a warrant was issued for the arrest of "Linnie McCollan." *Id.*

On December 26, 1972, Linnie was stopped for running a red light in Dallas. *Id.* A routine warrant check revealed that "Linnie McCollan" was wanted in Potter County and the real Linnie was taken into custody over his protests of mistaken identification. *Id.* The Dallas Police Department contacted the Potter County Sheriff's Department, compared the identifying information on Linnie's driver's license with that contained in the Potter County arrest records, and "understandably concluded that they had their man." *Id.* On December 30, Potter County deputies took custody of Linnie and placed him in the Potter County Jail in Amarillo. *Id.* He remained there until January 2, 1973, when officials compared his appearance against a file photograph of the wanted man and, recognizing their error, released him. *Id.*

Linnie McCollan sued the sheriff of Potter County under § 1983. *Id.* The Supreme Court found that while McCollan's claim that his detention in the Potter County Jail may have been wrongful under a tort law analysis, his detention was not unconstitutional. *Id.* at 142–43. The Supreme Court reasoned as follows:

> Absent an attack on the validity of the warrant under which he was arrested, [McCollan's] complaint is simply that despite his protests of mistaken identity, he was detained in the Potter County jail from December 30, when Potter County deputies retrieved him from Dallas, until January 2, when the validity of his protests was ascertained. Whatever claims this situation might give rise to under state tort law, we think it gives rise to no claim under the United States Constitution. [McCollan] was indeed deprived of his liberty for a period of days, but it was pursuant to a warrant conforming, for purposes of our decision, to the requirements of the Fourth Amendment. Obviously, one in [McCollan's] position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment. For the Constitution likewise guarantees an accused the right to a speedy trial, and invocation of the speedy trial right need not await indictment or other formal

> charge; arrest pursuant to probable cause is itself sufficient. We may even assume, *arguendo*, that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law.' But we are quite certain that a detention of three days over a New Year's weekend does not and could not amount to such a deprivation.

*Id.* at 143–45 (internal citation omitted). The Supreme Court further stated that a sheriff executing an arrest warrant is not constitutionally required to "investigate independently every claim of innocence . . . [n]or is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim." *Id.* at 146. As such, the Court concluded that McCollan had not been deprived of a right secured under the Constitution and thus had no cognizable claim under § 1983. *Id.* at 146–47.

Despite the striking similarity between Martinez's case and the facts of *Baker*, Martinez argues that *Baker* does not control the outcome of his case because the defendants had actual knowledge that Martinez was wrongly incarcerated early in the process—on March 16 (Pl.'s Br. in Opp. at 12–13, Docket # 35) and that he was wrongfully incarcerated for a period of six days (*id.* at 18–20). Martinez argues that Agent Santiago had "a mountain of exculpatory evidence at her disposal" by the morning of March 16 that she ignored, including: (1) a picture and fingerprint set for Hector M. Rodriguez; (2) Martinez's Social Security Card, mother's name and phone number, and sister-in-law's name and phone number by Sandra Collazo, Martinez's girlfriend; (3) information from McGrath that Martinez was incarcerated on January 31, 2015, the date of the offense for which Rodriguez was on probation; (4) she could have obtained a photograph and identification of Martinez through McGrath; and (5) she could have obtaining a booking photograph of Rodriguez to

13

compare to Martinez. (*Id.* at 15.) Martinez also relies on Agent Santiago's open records request facsimile sent on March 16 as undisputed evidence that she *knew* she had the wrong man in custody because she stated that Rodriguez's "brother Eli Martinez was recently arrested on 03/15/18 and placed on hold due to this situation." (*Id.* at 15–16.)

Martinez cites two out-of-circuit cases, *Cannon v. Macon County*, 1 F.3d 1558 (11th Cir. 1993) and *Sanders v. English*, 850 F.2d 1152 (5th Cir. 1992) for the proposition that *Baker* does not control if a defendant either knew or should have known that the plaintiff was wrongfully detained. (*Id.* at 13–16.) But I need not address these cases when there is clear Seventh Circuit law on point. The Seventh Circuit has addressed *Baker*'s bounds in multiple decisions. *See, e.g., Coleman v. Frantz*, 754 F.2d 719, 723–24 (7th Cir. 1985) (finding that *Baker* "supports, if not requires" the conclusion that the plaintiff's eighteen-day detention without an appearance before a judge or magistrate was a deprivation of liberty without due process of law"); *Patton*, 822 F.2d at 700–01 ("An innocent person was allowed to languish in jail for almost a week; and to arrest a person over his vigorous protest that he is the wrong man—a protest given some credibility in this case by the driver's license—and keep him in jail for this period without either investigating the case or bringing him before a magistrate raises serious constitutional questions."); *Garcia v. City of Chicago, Ill.*, 24 F.3d 966, 973–74 (7th Cir. 1994) (Cudahy, J. concurring in part) ("Since *Baker*, courts have found that prolonged pre-trial detention without any investigation can constitute a deprivation of liberty without due process . . . *Baker* does not, then, preclude us from finding that the constitutionality of pre-trial detention may be questioned if the authorities deliberately ignore all indications that the detainee is innocent."); *Panfil v. City of Chicago*, 45 F. App'x 528, 534 (7th Cir. 2002) (unpublished) (finding plaintiff did not suffer a constitutional

14

deprivation when confined for four days, was brought before a magistrate judge, and the jail personnel and Public Defender's office conducted an investigation that revealed plaintiff's innocence and led to his release). What *Baker* and its Seventh Circuit progeny instruct is that a prolonged detention in the face of protestations of mistaken identity may violate the Constitution if the defendants fail to investigate the claim of innocence or timely bring the person before the Court or if the defendants deliberately ignore all indications that the person is innocent.

Martinez also cites to a decision from the Northern District of Illinois, *Johnson v. City of Chicago*, 711 F. Supp. 1465 (N.D. Ill. 1989), in support of his position that the defendants violated his due process rights. But *Johnson* does not help his cause. On a motion to dismiss, the *Johnson* court allowed the plaintiff's due process claim to proceed based on his allegations that he was mistakenly incarcerated for six days. *Id.* at 1470. In so finding, the *Johnson* court noted that "[n]either the Supreme Court nor the Seventh Circuit has been very hospitable to Fourteenth Amendment claims in section 1983 actions based on a theory of mistaken identification by law enforcement officials," *id.* at 1469, but concluded that "a prolonged detention, coupled with the failure to investigate a claim of mistaken identification, may suggest a deprivation of liberty without due process," *id.* at 1470. The *Johnson* court noted that in addition to the fact the plaintiff alleged he was incarcerated for six days, he pled that law enforcement failed to take even minimal steps to determine whether they had the right person in custody. *Id.*

What occurred in Martinez's case is a far cry from a prolonged detention with no effort to ascertain whether Martinez's protestations of mistaken identity were legitimate. To begin, the parties dispute whether Martinez was incarcerated for four days or six days.

15

Neither the *Baker* Court nor the Seventh Circuit impose a bright-line rule as to what constitutes "prolonged" detention. In this case, the dispute is not dispositive. It is undisputed that Martinez was lawfully in custody on March 14 based on his arrest for battery, and remained lawfully in custody until the district attorney's office decided not to charge him on March 15. In fact, Martinez does not argue that the defendants had "actual knowledge" that he was wrongly incarcerated until Friday, March 16. (Pl.'s Br. at 13.) Thus, Martinez was only allegedly wrongfully detained from Friday until Tuesday afternoon—neither defendant was scheduled to work on Saturday and Sunday.

As to the investigation taken, recall that at the time Agent Santiago took over Rodriguez's supervision in 2016, she had never seen Rodriguez, who was on the run. There was a warrant out for his arrest containing the alias of "Ely M. Martinez" with Martinez's date of birth. In 2017, Agent Santiago received information allegedly relating to Rodriguez's whereabouts that resulted in police attempting to arrest Hector Rodriguez, Jr. Thus, in 2018, when Eli Martinez was arrested for domestic violence battery and a warrant came back with Martinez's date of birth and the name Hector M. Rodriguez with an alias of "Ely Martinez," Agent Santiago, aware of the previous misidentification, made sure that this Hector M. Rodriguez was not the Hector Rodriguez, Jr. they mistook for Rodriguez the year before. Agent Santiago was not at this point, however, on notice that Hector M. Rodriguez and Ely Martinez were two different people.

Later on the morning of March 16, however, Martinez's partner, Collazo, met with Agent Santiago and Garay and told them that they had the wrong man in custody. She provided them with Martinez's social security card and informed them that Martinez and Rodriguez were two different people—brothers. Both defendants acted immediately upon

16

learning this information. Agent Santiago attempted to call Rodriguez's wife and called Martinez's former probation officer in Pennsylvania. Both Garay and Agent Santiago attempted to receive booking information, including photographs and fingerprints, for both Martinez and Rodriguez. Agent Santiago followed-up with the relevant parties on Monday morning when she did not receive the information she sought on Friday afternoon. And when Agent Santiago received booking photographs and other identifying information for both Rodriguez and Martinez by 2:50 p.m. on Monday, she immediately went to Garay to begin the process to release Martinez. Both Agent Santiago and Garay, believing Martinez would not be released that night because of the late hour, did not act that night, but immediately met with Martinez Tuesday morning. He was released by Tuesday afternoon.

Martinez does not dispute that Agent Santiago and Garay took the actions that they did to investigate his claim of mistaken identity; rather, Martinez asserts that the steps taken were either insufficient or unnecessary to determine whether Eli Martinez was Hector M. Rodriguez. (*See* Pl.'s Resp. to DPFOF ¶¶ 39, 44, 51, 54, 68.) For example, Martinez faults the defendants for not doing enough to ascertain his identity quickly, arguing that by Friday morning the defendants could have obtained photographs and identifying materials for both Martinez and Rodriguez through various sources. (Pl.'s Br. at 15.) However, the undisputed facts show that Agent Santiago *was* in the process of obtaining these photographs and other identifying information. Perhaps Agent Santiago did not pursue this information in the most efficient way, but the Constitution does not guarantee a perfect investigation. *See Baker*, 443 U.S. at 146.

Martinez further argues that the defendants took unnecessary steps to verify his identity; specifically arguing that identifying information for both men was not needed to

17

determine Martinez's identity. (Pl.'s Resp. to DPFOF ¶ 56.) It was not unreasonable, however, for the defendants to seek identifying information for both Martinez and Rodriguez, in order to ensure that they had the correct person in custody. *See Hernandez v. Sheahan*, 455 F.3d 772, 777–78 (7th Cir. 2006) ("To appreciate the risk of error, one has only to consider the point that Hernandez and his wife made: that very reliable documents (such as a passport) demonstrate that his first name is Emiliano. Yet that's only half the equation. What if Emiliano were indeed the wanted man, but the warrant was in the name of Enrique because Hernandez had put an alias over on the police and prosecutor responsible for the warrant? Sooner or later a prisoner and his family might find a jailer who did not appreciate *that the validity of both names (and other details) must be pinned down before it is possible to know whether Emiliano and Enrique Hernandez are the same person*. A jailer who did not understand this would make an error, and the error would prove irreparable if the wanted person could not be recaptured.") (emphasis added).

Martinez also cites Agent Santiago's statement in her March 16 open records request that "Eli Martinez was recently arrested on 03/15/18 and placed on hold due to this situation," as a smoking-gun admission that she knew she was holding an innocent man in custody. But considering the totality of Agent Santiago's statement, coupled with the undisputed facts in the record as a whole, it is clear that Agent Santiago requested the documents to "make sure we can place the right person in custody," not as an admission that she was knowingly detaining an innocent man.

Finally, Martinez faults the defendants for not immediately securing his release on Monday night after Agent Santiago was confident that she had enough information to positively identify Martinez. It is undisputed that generally all MSDF release requests

18

needed to be submitted by 2:45 p.m. and that Garay received an email on September 15, 2017 detailing this policy. (Garay Decl. ¶¶ 43–44, Ex. 1004.) It is also undisputed that MSDF had a policy for emergency situations, stating in the same September 15, 2017 email that: "if you have an emergency situation where you need to have an offender released after this deadline, MSDF has agreed to work with us to the extent they are able. An example of emergency would be an offender with medical concerns." (*Id.*) Niel Thoreson, the Regional Chief for the Division of Community Correction in Milwaukee County, undisputedly testified that he believed that a person being held "illegally or without a basis" would constitute an emergency situation. (Thoreson Dep. at 19–24.) The defendants' mistaken belief as to the MSDF's after-hours release policy, however, does not rise to the level of a constitutional violation. Again, the Constitution does not guarantee an error-free investigation into claims of innocence. *See Baker*, 443 U.S. at 146. While it is understandable that a person would not want to be in jail a minute longer than necessary, the defendants' error regarding after-hours release only delayed Martinez's release until the following afternoon. Perhaps the defendants' actions were negligent, but a showing of more than negligence is required to demonstrate a constitutional violation. What is clear from the undisputed facts of the record is that Martinez has not shown a constitutional violation. For these reasons, the defendants' motion for summary judgment is granted and this case is dismissed.

## CONCLUSION

In this unfortunate case of mistaken identity, Martinez spent five nights in jail while law enforcement verified his protestations of innocence. In no way do I intend to minimize Martinez's experience. However, while the Constitution requires that authorities take action

19

to investigate a person's claim of mistaken identity, it does not guarantee that the investigation will be perfect. Martinez may disagree with the actions taken by Agent Santiago and Garay, but the undisputed evidence show that the defendants did not ignore Martinez's claims, but investigated them and ultimately secured his release. "'Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.'" *Baker*, 443 U.S. at 145 (quoting *Patterson v. New York*, 432 U.S. 197, 208 (1977)). On this record, no rational trier of fact could find the defendants' actions amount to a constitutional violation.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (Docket # 26) is **GRANTED**. The plaintiff's complaint is dismissed. The clerk of court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 3rd day of May, 2021.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge